CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

AUG 2 9 2008

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| BETSY BLANKENSHIP,<br>  Plaintiff, | )<br>)<br>) Civil Action No. 7:07cv0391 |
| v. | )<br>) |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY<br>  Defendant. | )  By: Hon. Michael F. Urbanski<br>)  United States Magistrate Judge<br>) |

## MEMORANDUM OPINION

Plaintiff, Betsy Blankenship ("Blankenship"), brought this action for review of the Commissioner of Social Security's decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33, 1381-83. The parties have consented to the court's jurisdiction and the case is before the court on cross motions for summary judgment. The only issue on appeal is whether the ALJ erred in his evaluation of the severity of Blankenship's mental impairments, by according greater weight to the opinion of Dr. Robert L. Muller, Ph.D., than to the opinion of Blankenship's treating physician Dr. Patricia Henderson. Having reviewed the record, and after briefing and oral argument, the case must be remanded as the decision of the Commissioner is not supported by substantial evidence.

### I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [Commissioner] if they are supported by substantial evidence and were

reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).

2

This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. Id. Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the RFC,[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Blankenship was 35 years old at the claimed onset date of August 31, 2000 (Administrative Record ("R.") at 55) Blankenship's previous jobs were as a warehouse worker, a cashier, and as a flagman. (R. 418-19) Blankenship alleges she is disabled as a result of her bipolar disorder. (R. 68)

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g. pain). See 20 C.F.R. § 404.1529(a).

3

The ALJ held a hearing on March 22, 2007 and issued a written opinion on April 4, 2007. (R. 29, 410) The ALJ found that Blankenship suffers from a severe mental impairment but denied Blankenship's claim for benefits based on her age, education, work experience, and RFC. (R. 19-20) The ALJ found mental limitations including poor ability to deal with the public, use judgment with the public, and understand, remember, and carry out complex job instruction; fair ability to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, understand, remember, and carry out detailed, but not complex, instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability; and good ability to understand, remember, and carry out simple job instructions. (R. 20). Based on this RFC, the ALJ concluded, at step four, that Blankenship was capable of performing her past relevant work as a warehouse worker. (R. 29) The ALJ's decision became final for the purposes of judicial review under 42 U.S.C. § 405(g) on June 19, 2007, when the Appeals Council denied Blankenship's request for review. (R. 6-8) Blankenship then filed this action challenging the Commissioner's decision.

### III.

Blankenship argues that the ALJ erred in his evaluation of her mental impairments. Specifically, Blankenship argues that the ALJ erred by adopting the opinion of the independent expert clinical psychologist, Dr. Muller, over the opinion of her treating physician Dr. Henderson. (R. 28) To determine whether the ALJ's decision to adopt Dr. Muller's opinion over Dr. Henderson's opinion is supported by substantial evidence, the court must delve into Blankenship's treatment for her mental impairments, which is extensive and varied.

4

Blankenship's mental medical history starts on September 12, 1999, before her alleged onset date. (R. 133-38) On that date, Blankenship was admitted to the University of Virginia Medical Center. On admission, Blankenship had a global assessment of functioning (GAF) score of 5.[2] (R. 133) Blankenship was diagnosed with delirium secondary to unknown substances. Id. This diagnosis is primarily based on Blankenship's own admission that she ingested unknown brown pills from a friend, while self-medicating with alcohol and intermittently using cocaine. (R. 137) Upon discharge, Blankenship was involuntarily committed to Western State Hospital on September 15, 1999. (R. 137) Blankenship underwent a mental status examination during her three day stay Western State Hospital and was discharged on September 18, 1999 with a GAF score of 70.[3] Western State Hospital discharged Blankenship noting that the episode which lead to her commitment to the University of Virginia Medical Center was a result of an overdose of tricyclic antidepressants, the unknown brown pills. (R. 153) Western State Hospital noted that Blankenship's "thoughts are organized, goal-directed and coherent, and there are no perceptual distortions. Cognition is intact. Her affect is of full range and appropriate to the situation. She has been consistently free of depression and/or suicidal ideation over the whole course of this short hospitalization." (R. 157)

---

[2] A GAF score of 1-10 indicates a persistent danger of severely hurting one's self or others, persistent inability to maintain minimum personal hygiene, or serious suicidal act with clear expectation of death. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 32 (4th ed. 1994).

[3] A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

Blankenship was next seen by Dr. Kurt W. Hubach on January 27, 2000 after an acute manic episode. (R. 232) Dr. Hubach noted that she "had a good response to Haldol," and wrote her a prescription for 300 mg of Lithium[4] to be taken twice a day. (R. 232) Dr. Hubach next saw Blankenship on June 9, 2000, to follow-up on her depression. (R. 231) Dr. Hubach noted that "[s]he actually seems to be in a major depression presently as she describes hopelessness, changes in sleep habits as well as alteration in eating." (R. 231) As a result, Dr. Hubach discontinued BuSpar and Ambien and prescribed Zoloft instead. (R. 231) On October 24, 2000, Dr. Hubach noted that Blankenship was taking 100 mg a day and "doing quite well. She has had a remarkable improvement in her affect and in general feels well." (R. 228) Dr. Hubach's notes from November 7, 2000 reveal a slight degradation in her anxiety and depression due to a cessation of Zoloft. (R. 227) On January 25, 2001, Dr. Hubach diagnosed Blankenship with bipolar disorder with an acute manic episode. (R. 224) At this time, Dr. Hubach discussed psychiatric hospitalization, but Blankenship was adamantly opposed to the idea. Id. Instead, Dr. Hubach decided to "manage the situation as an outpatient unless her behavior decompensates." Id. Dr. Hubach also noted that "she has had a manic episode approximately every three months over the last year." Id.

Blankenship was subsequently admitted to Stonewall Jackson Hospital on March 6, 2001, for another manic episode where she admitted to wanting to harm herself. (R. 171-81) Two months later, on May 16, 2001, Blankenship was seen by Dr. Hubach for a follow-up, during which he noted improvement in her bipolar disorder and no recent manic episodes.

---

[4] Lithium is "used in the treatment of acute manic and hypomanic states in bipolar disorder and in maintenance therapy to reduce the intensity and frequency of subsequent manic episodes." Dorland's Illustrated Medical Dictionary 1059 (30th ed. 2003).

6

(R. 220-21) By June 21, 2001, Dr. Hubach noted that Blankenship was feeling depressed and tearful and that her bipolar disorder had deteriorated. (R. 218) Dr. Hubach again noted improvement on December 13, 2001. (R. 214)

On January 10, 2002, Blankenship was admitted on a court ordered voluntary basis to Catawba Hospital. (R. 195) The notes from this hospital stay reveal that Blankenship was unable to take her medication for a period of weeks because of the flu, which resulted in "both manic symptomatology for periods of days and then depressive symptomatology for periods of days." Id. Upon admission her GAF score was 37.[5] She was discharged on January 15, 2002, despite being advised to continue her hospital stay, because she had not fully recovered from the manic symptomatology. (R. 196) On discharge her GAF score was still only 49.[6]

After being discharged from Catawba Hospital, Blankenship sought counseling from Alleghany Highlands Community Services to better understand her bipolar disorder. (R. 233-247) Blankenship was seen by Alleghany Highlands Community Services from January 23, 2002 through April 12, 2002. Blankenship had a GAF score of 55 throughout her counseling at Alleghany Highlands Community Services.[7] (R. 236, 244, 247, 258) Blankenship's treatment program at Alleghany Highlands Community Services was discontinued after she stopped attending her therapy sessions.

---

[5] A GAF score of between 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[6] A GAF score of between 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

[7] A GAF score of between 51-60 Moderate symptoms or any moderate difficulty in social, occupational, or school functioning.

7

On September 24, 2002, Blankenship was seen by Dr. James W. Worth on referral from Disability Determination Services of Roanoke for a consultative mental status evaluation. (R. 272) At this time Blankenship had a GAF score of 59. (R. 277) Dr. Worth noted that "if she can remain sober and her mood continues to stabilize, she may be able to handle employment." (R. 277)

Blankenship began seeing her primary care physician, Dr. Henderson, on December 17, 2003, (R. 358), and continued to see her through January 4, 2007. (R. 394-95) On the first visit, Dr. Henderson prescribed Lexapro[8] on a trial basis. (R. 358) Dr. Henderson followed up with Blankenship on January 22, 2004 and noted that she was doing well on Lexapro. (R. 355) On August 19, 2004, Dr. Henderson exclaimed that Blankenship was doing well with no mood swings and that the "Lexapro has worked well!!" (R. 353) (Punctuation in original) Dr. Henderson next saw Blankenship on February 15, 2005, and the medical notes reveal that she was doing well. (R. 351) Six months later on August 19, 2005, Dr. Henderson again noted that Blankenship was doing well on Lexapro. (R. 348)

By February 24, 2006, however, Blankenship was no longer responding well to her prescription of Lexapro. (R. 345) Dr. Henderson's treatment notes from that day indicate that Blankenship was experiencing increased anxiety and depression, which led Dr. Henderson to increase Blankenship's daily dose of Lexapro. (R. 345) The next visit dealing with Blankenship's mental health took place on October 4, 2006. (R. 400) Blankenship was having difficulty sleeping prior to this visit, because she was experiencing significant amounts of stress

---

[8] Lexapro is a trademark for a preparation of escitalopram oxalate which is a selective serotonin reuptake inhibitor (SSRI) used as an anti-depressant. Dorland's Illustrated Medical Dictionary 642, 1025 (30th ed. 2003).

8

as her house had burned down and she did not have any Lexapro or Ambien to help her deal with the situation. (R. 400) Dr. Henderson gave her samples of both. (R. 400) Dr. Henderson saw Blankenship three more times between November 17, 2006 and January 4, 2007, but no mention of her mental health status was made during any of these visits. (R. 396-97, 398-99, 394-95)

On January 2, 2007, Blankenship was evaluated by Dr. Bruce Sellars at the request of Disability Determination Services. (R. 383) Dr. Sellars administered the Minnesota Multiphase Personality Inventory II (MMPI-II), but could not interpret the results because Blankenship "presented more extreme psychological problems than most psychiatric inpatients." (R. 385) Dr. Sellars did give Blankenship a GAF score of 52 , and noted that "[s]he likely would be able to perform simple and repetitive tasks and to a degree, some more complex tasks. As long as her mood is well stabilized, she likely could perform work activities consistently and attend a normal work day or work week without interruption." (R. 386) He also reported that she would have difficulty working "with the public as there seems to be some degree of intense anxiety in public situations which may be reminiscent of a social phobia. She likely would have difficulty tolerating stress." (R. 387)

The medical record of evidence reveals that Blankenship has had difficulty regulating and controlling her bipolar disorder over several years for a number of reasons. Namely, the ability to obtain and take her medication on a consistent basis and outside stressors have induced manic symptamology on numerous occasions. Both Dr. Sellars and Dr. Worth opined that Blankenship would likely be able to reenter the work force as long as her mood was sufficiently stabilized.

With this history in mind, the court must turn to the proper standard to apply in determining the weight given to a treating physician. An ALJ is required to analyze every

9

medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. § 404.1527 (d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide her reasons for giving a treating physician's opinion certain weight or explain why she discounted a physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

In this matter, the ALJ afforded greater weight to the opinion of Dr. Muller, an independent expert clinical psychologist than to the opinion of Dr. Henderson. Had Dr. Henderson's opinion been adopted in full, then a favorable decision would have been rendered

10

for Blankenship, but because the ALJ adopted Dr. Muller's opinion instead, benefits were not awarded.

Dr. Muller testified at the administrative hearing in this matter on March 22, 2007. Dr. Muller never examined or treated Blankenship prior to testifying at the hearing, but did review her medical records. (R. 433-34) Dr. Muller testified that:

> So in summary, Your Honor, this is an individual who, I think, has a documented history of bi-polar disorder. There's no doubt. But it seems that as long as she's taking her medications reliably that I do think she would be capable of, of handling simple repetitive tasks in a low stress setting, and with limited contact with the public.

(R. 439) In making this determination, Dr. Muller notes that upon discharge from Blankenship's first hospitalization at University of Virginia Medical Center her GAF score was 100 and "that she was quite stable at that point." (R. 434) Based on this testimony, the ALJ writes in the opinion that Blankenship "had a global assessment of functioning level (GAF) of 5 when she was first admitted and of 100 on discharge, with a statement that she was quite stable." (R. 24)

There is no doubt that the ALJ relied on Dr. Muller's testimony in reaching this conclusion. Review of the medical evidence from that hospitalization and the subsequent hospitalization at Western State Hospital, however, reveals that this testimony is in error. While Blankenship did present with a GAF of 5 upon admission, there is no indication that she had a GAF of 100[9] upon discharge in the records from UVA. In fact, Blankenship was transferred directly from UVA to Western State Hospital for continued hospitalization. (R. 137) An individual with a GAF of 100 would not need continued hospitalization, let alone hospitalization

---

[9] A GAF score of between 91-100 indicates superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many qualities. No symptoms.

11

for another three days before being released with a GAF of 70. As such, Dr. Muller's testimony was fundamentally flawed. The ALJ's reliance on fundamentally flawed testimony of a reviewing psychologist over the opinion of Blankenship's treating physician does not constitute substantial evidence.

V.

At the end of the day, Blankenship may not be able to meet her burden of establishing that she is totally disabled. However, it is not the province of a reviewing court to make a disability decision. Rather, it is the court's role to determine whether the Commissioner's decision is supported by substantial evidence. Here, plainly, the Commissioner's decision is flawed as he adopted the opinion of a reviewing psychologist who testified in error as to Blankenship's medical records. To compound this error, the opinion of the reviewing psychologist was adopted over the opinion of Blankenship's treating physician. As such, this case must be reversed and remanded to the Commissioner for further administrative proceedings consistent with this opinion to include an independent consultative psychiatric examination and evaluation of Blankenship.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Enter this 28th day of August, 2008.

_____
Michael F. Urbanski
United States Magistrate Judge